Argued September 14; affirmed as modified October 18, 1949

# GOLDSON *v.* GOLDSON

210 P. 2d 478

*Mood W. Eckley,* of Portland, argued the cause for appellant. With him on the brief was James H. Ganoe, of Portland.

*Clifford S. Beckett,* of Oregon City, argued the cause for respondent. With him on the brief were Butler, Jack, Beckett & Holman, of Oregon City.

Before BRAND, Acting Chief Justice, and ROSSMAN, BAILEY, HAY and PAGE, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff (wife) from a decree of the Circuit Court which (1) dissolved the marriage contract theretofore existing between the parties; (2) granted the defendant (husband) the decree of divorce; (3) awarded the defendant general custody of the three minor children of which the parties are the parents; (4) adjudged that the parties thereafter owned, as tenants in common, a parcel of real property which they had occupied as their home and which they had previously owned by the entireties; (5) adjudged that the plaintiff was the sole owner of another parcel of real property occupied by a service station; and (6) made adjudications in regard to the ownership of a number of items of personal property.

The suit was instituted by the plaintiff through a complaint which charged her husband with cruelty and sought, not only a divorce, but also the custody of the children and an adjudication that she was the owner of all of the aforementioned property, both real and personal. She further sought alimony, an attorney's fee and support money for the children. The answer denied the charges of cruelty mentioned in the complaint and made counter charges of cruelty against the plaintiff. Its prayer sought the custody of the children and an adjudication that the defendant was the owner of all of the property, real and personal, above mentioned.

. . The parties were married January 16, 1940, in Stevenson, Washington. The children aforementioned are two girls and one boy. One of the girls is ten years of age, the other is nine and the boy is seven. The plaintiff is the natural mother of all three, but the defendant is the natural father of only two of them. He is the adoptive father of the older girl. There is no contention that he has not shown his adopted daughter as much affection and attention as he has his natural children. Evidently his affection for his adopted daughter was conceded, for no witness even mentioned the subject.

January 6, 1947, while the defendant was at work, the plaintiff took the three children and permanently left the family home. This was done without the defendant's consent, although it was preceded by discord which was not without its forebodings. A few days prior to Christmas, 1946, the plaintiff had taken an unannounced departure from the home, but returned later upon the defendant's coaxing. Shortly after the plaintiff's final departure she took the boy to a relative in Scottsburg and left him there. Through the medium of an advertisement she found a place for the younger daughter and left her there. She entrusted the older daughter on a part-time basis with a friend. Some months after the boy was left in Scottsburg he was given over to a paid caretaker in Portland. The plaintiff refrained from informing the defendant of the disposition she made of the children. About seven months after the plaintiff's departure from the family home she secured employment, but, as we have seen, she disposed of the children long before work demanded her time.

The year 1945 was the climactic one in the domestic life of these two people. In that year the plaintiff

received a bequest which, as augmented by a previous smaller one, totaled $20,000. After the plaintiff's receipt of the legacy the parties purchased a five-acre tract of land improved with a dwelling house which became their home. That property is mentioned in the previous paragraph of this opinion. Title to it was taken in the joint names of husband and wife as an estate by the entireties. Payment of the purchase price was made out of the inheritance. Shortly the other item of real property was purchased. It was improved with a service station, and, concurrently with its purchase, the defendant quit his previous occupation and became the operator of the station. Title to that property was taken in the plaintiff's name only. Not long after these purchases were made, discord crept into the domestic life of the parties. The plaintiff claims that the defendant's affection for her cooled and, upon her behalf, it is argued that after the source of her inherited wealth was exhausted the defendant's interest in her ceased.

As already indicated, the defendant became the operator of the service station after the plaintiff purchased it. The latter concedes that her husband "always treated the customers quite nice" and she seemingly found no serious fault with the manner in which he operated the station. Its purchase price was $12,000, $7,500 of which was paid by the plaintiff at the time of purchase. The balance was payable in semi-annual installments of $625 each. The defendant met two of these demands out of the earnings of the station before the plaintiff left him.

Although the year 1945 was crucial, the plaintiff dwelled upon two matters which presented themselves prior to that year. We shall consider them before mentioning the incidents that took place in 1945. One

of the two matters was idleness on the part of the defendant in the first three months (January, February and March) following the marriage. In that period the defendant lacked employment and for several months following that time his work was irregular. The plaintiff stressed that matter to a greater extent than any other phase of the case. At the time of their marriage, the defendant was the owner of a logging truck and had been earning his living hauling logs in the Coast Range. The plaintiff does not claim that she was ignorant of those facts. The evidence indicates that in the rainy season logging trucks which operated in the Coast Range were frequently idle. Further, in 1940, unemployment was general throughout the country. Almost seven years passed after the period transpired which we have just mentioned before the separation took place. If in those seven years the plaintiff accused the defendant of being at fault for not having found employment more promptly, no witness mentioned the fact. The unemployment, dispiriting thought it was, was not the cause of the separation. At the close of the period of unemployment and intermittent work, the defendant displayed industry and before long secured steady work. He faithfully deposited his pay checks in a joint bank account which he and his wife had established.

The other episode which occurred before the year 1945 took place when the first child was born to the couple. The defendant did not then take his wife to a hospital. However, the nearest hospital was fifty miles distant, the night was stormy, and the birth was preceded with such inadequate warnings that the physician who was summoned arrived only ten minutes before the infant. Moreover, the plaintiff had not expressed a wish to go to a hospital and her long-

postponed complaint about the absence of hospitalization is suggestive of an afterthought.

It appears to us that the events that took place prior to 1945 can be dismissed as not the causes of the discord and the eventual separation.

The testimony which disclosed the unhappy events that began to transpire about the middle of 1945 came not only from the parties themselves, but also from some of their neighbors. Two of these testified for the plaintiff, six for the defendant. These witnesses appear to have been of approximately equal quality, and, with the exception of one who testified for the plaintiff and one for the defendant, they had not become noticeably partisan.

Bereft of detail, the testimony presented by the plaintiff has a tendency to show: (1) Beginning in the latter part of 1945 the defendant became irritable and towards the end of 1946 began to talk about papers in a divorce suit which he would shortly file. (2) The couple at times engaged in arguments, the most spirited of which seemingly occurred when both wished to enter their younger daughter, slightly less than six years of age, in grammar school but were thwarted by a local school rule. It is difficult to find a basis for the disputations in which they engaged. (3) Shortly before the plaintiff left the defendant he told her that he no longer cared for her. (4) Sometime after the service station was purchased, the defendant manhandled her. The circumstances were these: He threw a bunch of keys at her which she, in concededly "hot temper", picked up and threw back at him with such accuracy that they inflicted a wound from which blood flowed. When he repaired to the bathroom to remove the blood she seized the bathroom door knob for the purpose of preventing his escape and in the ensuing

struggle was forced against the tub, resulting in the breaking of a bone in her arm. (5) The defendant repeatedly implored the plaintiff to sign some papers whereby there would be transferred to him an interest in the service station. (6) His interest in the plaintiff was mercenary and not based upon affection. (7) When their young son was afflicted with an abscessed ear the plaintiff urged the defendant to lend assistance, he displayed indifference. (8) The defendant bestowed undue attention upon a young woman who worked in a tavern near the service station and was seen one night in a parked automobile embracing her. (9) The defendant was cruel to the children and upon one occasion, when they were playing with matches, burned their fingertips for the purpose of showing them the dangers that lurk in matches. (10) The defendant threatened to kill the children rather than permit the plaintiff to have their custody. And (11) upon one occasion the defendant returned home "quite intoxicated." The two words just quoted were the plaintiff's. No one else attributed drinking or intoxication to the defendant.

The defendant, in addition to denying the testimony indicating that he was at fault, presented evidence which, when stripped of details, had a tendency to show the following: (1) The plaintiff bestowed undue attention upon one John Patterson, the defendant's helper in the service station, and likewise upon several other men. (2) Upon the occasion when the plaintiff says the defendant "manhandled" her, she had spoken at the breakfast table in commendation of Mr. Patterson, and thereupon he, the defendant, threw the keys for the station upon the table and told her to let Patterson operate it. The plaintiff promptly seized the keys and flung them at the defendant, inflicting a wound

in his neck from which blood flowed. When he repaired to the bathroom the plaintiff held the door shut and when he sought to open it the plaintiff was jostled. The defendant denied that any of the plaintiff's bones were broken. (3) The plaintiff commonly employed profane and filthy language. She applied profane names to the defendant before customers at the service station and used profanity in the presence of the children. When she was requested to cease its use in the children's presence, she persisted for the purpose of antagonizing the defendant. Presently the children incorporated into their own speech some of the profane appellations which she had applied to them. (4) The plaintiff was frequently absent from home, often until late hours of the night; upon one of those occasions the match episode took place, which we mentioned in our resume of the plaintiff's evidence. The defendant denied that he burned or injured the children's fingers. (5) The plaintiff at times was cruel to the children and on one occasion kicked the younger daughter in the stomach when her (the mother's) foot was clad in a wooden shoe and injured the child severely. (6) When the defendant took his wife to dances she embarrassed him by bestowing her attention upon other men, even going to the extent of sitting upon their laps. (7) The plaintiff neglected her household duties to a deplorable extent. She permitted dishes to remain unwashed for days, failed to clean her house, permitted food to spoil, and after the defendant washed the family clothing she failed to hang it on lines and permitted it to rot. (8) The plaintiff neglected the children and frequently remained in bed when she should have prepared breakfast for them, with the result that they ate whatever items they could find or were given breakfast by the neighbors. Even

one of the plaintiff's own witnesses, when asked upon direct examination whether Mrs. Goldson had neglected her children, replied, "I can't say they were completely neglected." (9) She failed to keep the children's clothing clean and sometimes they went to school with hair that had not been combed for some days. (10) The plaintiff told her neighbors that she would kill the children before permitting the defendant to have their custody. (11) Upon an occasion the plaintiff "got tight" and in its course had intercourse with a man whose identity was unknown to the defendant, with the result that she was compelled to seek hospital relief from the resulting consequences.

Although witness after witness described the profane language which the plaintiff commonly employed, even in the presence of her children, the plaintiff made no effort to refute their testimony. One of these witnesses described her language as "filthy", another as "vulgar", and still another as worse than that employed by the man on the street. More than one swore that she could not utter a sentence without using at least one profane word. It is clear that the plaintiff's addicition to profanity was not acquired from the defendant, for she testified: "No, he never did curse me." Nor did the plaintiff contradict testimony which indicated that when her foot had a wooden shoe upon it she kicked her younger daughter in the stomach so severely that a physician's aid was required. Likewise, she left undisputed testimony which showed that she was frequently in the company of men late at night. When her husband protested, she replied that it was "none of your damned business." The unchallenged testimony of one of her married neighbors indicated that the plaintiff often came to her home shortly before the witness left for her place of employment

and remained there in the company of her husband after she (the witness) had departed. This neighbor swore that she became distressed over the situation and requested the plaintiff to leave her house concurrently with her own departure. Her requests were ignored. The testimony which revealed the deplorable condition resulting from the plaintiff's inattention to her household duties was not contradicted. Unwashed dishes accumulated in the kitchen from meal to meal and from day to day. Soiled clothing littered the floor, the beds and the space under them. Food remained in the uncleaned electric refrigerator until it rotted and gave the refrigerator a repellant odor. Sometimes the neighbors came in and brought order to the household, which one of them termed "a tremendous mess." The testimony which showed the unkempt condition of the children met with scant explanation.

We said that the plaintiff made no effort to controvert the evidence which attributed to her addiction to filthy profanity and which showed that, as a result of inattention, her home was "a tremendous mess." The record authorizes us to add that some of the neighbors who gave this testimony were not even subjected to cross-examination. Evidence was presented, however, which indicated that in recent months the plaintiff's language has improved and that her housekeeping was comparable to that of some of her neighbors.

After the plaintiff left the family home January 6, 1947, she secured living quarters with a friend. We mentioned the manner in which she scattered the three children in different homes. Since she took quarters with her friend, the plaintiff had attended in the evenings lodge meetings, public dances and moving picture

theatres. The friend with whom she goes to the public dance halls described the frequency of their visits thus: "Sometimes once a week, sometimes twice, sometimes not for two or three weeks." The record does not indicate the frequency with which the plaintiff sees the two younger children, nor does it show the attention, if any, which she gives to them. We know nothing concerning the progress the children are making in school or in any other phase of their lives. A restraining order, which the plaintiff procured when she filed her complaint, has prevented the defendant from seeing the children and, of course, he has known nothing about the places where they are kept.

The defendant continues to reside in the family home which stands upon a five-acre tract near Jennings Lodge. When the family was together it kept three cows, many chickens and cultivated a vegetable garden. The home contains conveniences such as constant hot water, a washing machine and an electric refrigerator. The dwelling and its adjacent land appear well adapted to the needs of children. If granted the custody of the children, the defendant will return them to this place and have his mother assist him in caring for them.

We do not believe that the defendant attempted to adjure his wife into granting him an interest in the service station. The facts appear to be that when the station was purchased, the defendant and a friend planned to become partners in its operation, but the plaintiff refused her acquiescence. The discussions with the wife centered about this partnership and were not efforts to induce her to part with an interest in her property.

We shall not set forth a further analysis of the evidence. The trial judge saw and heard the wit-

nesses; he was in a better position than we are to determine which side told the truth; obviously, he concluded that the preponderance was with the defendant. We know of no reason for believing that he made a mistake.

We do not think that the defendant was a perfect husband, free from all faults. No wife can expect to receive from the marriage altar a perfect mate. We believe, however, that the defendant tried to make their marriage a success. He appears to have been attached to his home and family. He manifested a sense of duty, and appears to be anxious to discharge the obligations of parenthood. Although shortcomings were revealed in him in the crucible of the marital venture, they were not gross and their source was not in the heart. The defendant's imperfections, such as, for example, a proneness to participate in arguments, were not, we think, the cause of the separation and this suit for divorce.

We shall refrain from setting forth further the imperfections in the plaintiff's nature. We think that they were the cause of the unhappy situation which terminated the marriage in defeat and turned the children out of home. Neglect of the children, disregard of household duties, the constant use of vile profanity, absence from home in the late hours of the night and intimate associations with men whose identity she refused to divulge to her husband were offenses against the marriage vows which even the most placid might find impossible to tolerate. The plaintiff herself is to blame for the results that came from her persistent misconduct. It is to her credit that she so used her inherited money that the family obtained a suitable home and the defendant a place where, with his willingness to work long hours (7:00 a. m. to 10:00

p. m.), he could have promoted materially the family well-being. It is unfortunate that the plaintiff's inability to resist evil inclinations dissipated the bright hopes that were drawing near.

The situation presents the strange paradox of a couple that successfully met the hazards of adversity and unemployment, but succumbed when the pots of gold at the end of their rainbow came into their hands. Abundance for them was a greater peril than privation. The plaintiff's argument that the defendant's interest in her was mercenary possibly warrants the observation that after she found her erstwhile slender purse well filled she may have begun to look about in the expectation that she could do better.

■ Although not plead, the plaintiff invokes the doctrine of condonation. Condonation, however, is not applicable when misconduct is repeated. In this instance, the reunion after the first separation was promptly succeeded by repetition of the previous course of conduct. Then came the final departure—not by the defendant—by the plaintiff.

■ The issue placed before the Circuit Court was a difficult one. The decree appeals to us as just in all of its phases, with possibly one exception. The defendant is not the natural, but the adoptive, parents of the oldest of the three children who, the uncertain testimony of the plaintiff indicates, has lived with her part time since the plaintiff departed from the family home. It may be that the attacked decree should be modified by giving the plaintiff the custody of that child. We do not know. No modification should be made concerning this child in order to benefit the plaintiff, but, in the event that a modification would promote the welfare of the child, it should be made. However, nothing should be done unless it satisfactorily appears

that the improvement in the plaintiff's language, which some of the witnesses mentioned, has become permanent, and even then the modification should not be made unless it also appears that since she left the home the plaintiff has bestowed upon this daughter the care, attention and affection which mothers commonly bestow upon their offspring.

The cause is remanded to the Circuit Court for the purpose of conducting an inquiry of the kind just mentioned, and for the further purpose of making a modification if the facts warrant it. In all other respects the decree is affirmed. Costs and disbursements will be awarded to neither party.